RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GREGORY ATKINS, CHRISTOPHER GOOCH, KEVIN PROFFITT, and THOMAS ROLLINS, JR., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

TONY PARKER, Commissioner, Tennessee Department of Corrections, and DR. KENNETH WILLIAMS, Medical Director, Tennessee Department of Corrections, in their official capacities,

*Defendants-Appellees*.

No. 19-6243

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cv-01954—Waverly D. Crenshaw, Jr., District Judge.

Argued: June 17, 2020

Decided and Filed: August 24, 2020

Before: GILMAN, KETHLEDGE, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. James R. Newsom, III, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** Michael J. Wall, Karla C. Campbell, James G. Stranch, III, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. James R. Newsom, III, Steven A. Hart, Matthew R. Dowty, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

KETHLEDGE, J., delivered the opinion of the court in which MURPHY, J., joined. GILMAN, J. (pp. 9–15), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

KETHLEDGE, Circuit Judge.   Gregory Atkins and his fellow plaintiffs represent a certified class made up of Tennessee prisoners suffering from hepatitis C.  In 2016, they sued several officials in the state Department of Corrections, including its medical director, Dr. Kenneth Williams, alleging that the officials acted with deliberate indifference to the class's serious medical needs in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.  After a four-day bench trial, the court rejected the class's claim.  We affirm.

I.

A.

Hepatitis C is a contagious virus that spreads through contact with bodily fluids.  The virus causes liver damage that over time diminishes the liver's ability to remove toxins from the body.  In some cases, the virus can lead to cirrhosis of the liver, liver cancer, and ultimately even death.

Hepatitis C is a progressive virus, meaning that the disease's effects worsen over time.  In the first six months after initial infection, somewhere between 15 and 25 percent of infected persons spontaneously recover.  For those who do not recover, the virus proceeds to the "chronic" stage, during which the virus progressively scars the liver.  The rate at which the virus causes scarring differs from person to person.  Some people might not have serious scarring for 20 to 30 years, if at all; for others, scarring happens more quickly.  The most common symptoms of the disease—which range from minor (fatigue, jaundice, nausea) to major (severe inflammation, skin lesions, cognitive impairment)—are not necessarily tied to the extent of liver scarring an infected person has suffered.  Between 20 and 40 percent of persons who reach the chronic stage eventually develop cirrhosis; four percent develop liver cancer.

There is no vaccine for hepatitis C.  In the past, doctors treated the virus by injecting infected patients with drugs known as interferons, but that treatment brought little success and

severe side effects.  In 2011, the FDA approved a new class of drugs—known as direct-acting antivirals—that are superior to interferons in nearly every respect.  Notably, for almost all patients who take them, direct-acting antivirals halt the progress of hepatitis C and eventually cause the virus to disappear completely.  The antivirals are so effective that for the most part doctors have stopped using interferons entirely.

But that efficacy comes at a price.  In 2015, the cost of a single course of treatment using direct-acting antivirals was between $80,000 and $189,000.  By the time of trial, those prices had dropped to between $13,000 and $32,000 per course of treatment.

B.

In 2016, the efficacy—and cost—of direct-acting antivirals prompted the Department of Corrections to implement a treatment policy for hepatitis-C infected inmates.  Specifically, the 2016 policy specified that the Department would provide the antivirals only to infected inmates with severe liver scarring.  The policy provided no pathway to antivirals for inmates with less-advanced scarring, even if those inmates presented exceptionally worthy cases.

By 2019, approximately 4,740 of the 21,000 inmates in Tennessee's prisons had hepatitis C.  The virus's prevalence, along with the declining cost of direct-acting antivirals, prompted the Department to update its guidance for the "evaluation, staging, tracking, and other treatment of patients" with hepatitis C.  The Department's medical director, Dr. Williams, developed and oversaw the implementation of this new guidance, which applied to all hepatitis-C infected inmates in the state's prisons.

Under the 2019 guidance, every new inmate, with few exceptions, is tested for hepatitis C.  Inmates who test positive must then undergo a baseline evaluation, which includes a physical exam focused on the symptoms of liver disease, a medical-history check, a series of laboratory tests, a preventive-health assessment, and a battery of tests to measure the extent of the inmate's liver scarring.

The 2019 guidance also requires an advisory committee to evaluate each infected inmate and to determine his course of treatment.  Among other things, the guidance establishes criteria

that make antivirals available to "individuals [who] are at higher risk for complications or disease progression and may require more urgent consideration for treatment." Those criteria, which align with guidance promulgated by the Federal Bureau of Prisons, favor the sickest inmates—those with the most advanced scarring or other medical conditions that might accelerate their symptoms—for access to direct-acting antivirals. But the guidance also provides that the "prioritization criteria are not comprehensive and do not include all possible patient conditions or clinical scenarios. All treatment decisions are patient-specific." Ultimately, whether an infected inmate receives antivirals is up to the advisory committee.

Dr. Williams chairs that committee, which is made up of healthcare professionals, including an infectious-disease specialist and a pharmacist. The committee meets regularly and reviews the records of every infected inmate, regardless of his illness's progress. Because different cases require different courses of treatment, the committee is also responsible for selecting the specific combination of drugs an inmate will receive. Once the committee makes that selection, the inmate's local provider oversees his treatment and provides ongoing care.

The 2019 guidance also includes a "workflow"—a series of procedural steps for local providers—to make standard the administration of hepatitis C treatment across the prison system. To that end, the workflow provides instructions to medical providers for testing, diagnosis, recordkeeping, and follow-up treatment. For local providers, the workflow replaced an ad hoc system with a uniform one; and for the committee, the workflow aimed to speed up the process by which it assessed infected inmates.

Finally, the guidance provides for continuous care and monitoring of infected inmates, regardless of their course of treatment. At a minimum, every six months each infected inmate undergoes reassessment at a "chronic care clinic." The reassessment consists of a physical exam, bloodwork and other laboratory tests, patient-specific hepatitis C counseling, and additional measurement of liver scarring; inmates with advanced scarring also undergo an ultrasound screening for cancer. The committee then uses these data to determine whether to revise an infected inmate's course of treatment or—in the case of inmates who are not receiving direct-acting antivirals—whether to change their priority level for those drugs.

C.

In 2016, Atkins and his fellow plaintiffs brought this § 1983 suit against several officials in the Department, seeking declaratory and injunctive relief.  The plaintiffs alleged that the Department's "prioritization" approach amounted to deliberate indifference to the class's serious medical needs, in violation of the Eighth Amendment.  During the course of the litigation, the Department issued its 2019 guidance, and the parties then agreed to focus on that guidance (rather than the 2016 policy) at trial.

In July 2019 the court held a four-day bench trial, during which it heard testimony from experts on both sides, from infected inmates, and from Department officials themselves.  The plaintiffs presented a hepatitis C expert, Dr. Zhiqiang Yao, who testified that the "best practice" is to treat chronic hepatitis C with direct-acting antivirals "as early as possible" or "in a timely manner," regardless of the extent of scarring on a patient's liver.  In support, Yao cited the American Association for the Study of Liver Diseases' position that immediate treatment with direct-acting antivirals was the "standard of care" for patients with chronic hepatitis C.  Yao also testified that the Department's 2019 guidance was "under the standard of care" because it did not explicitly recommend early treatment using antivirals for all patients.  Yao nonetheless conceded that the Department's 2019 guidance was a "significant improvement" over the 2016 policy and that the prioritization approach was "understandable" given the Department's limited resources.  Yao also admitted that, when working for the Veterans' Administration, he had himself used a prioritization system for delivering care to hepatitis C patients, much like the one in the Department's 2019 guidance.  The court found Yao highly credible, going so far as to recommend that the Department "engage [him] to assist" in the Department's hepatitis C protocols in the future.

The court also heard testimony from Williams's experts, and—for good reasons, suffice it to say—found their testimony to be "weak" and characterized by personal agendas and a "gross lack of candor."  The court discounted their testimony entirely.

Williams himself testified and explained that that he was the "final authority" for the Department's policies on hepatitis C treatment.  Specifically, he said that he wrote the

Department's 2019 guidance, which according to him was designed to provide care to the sickest patients first. He also clarified that, unlike the Department's prior policies, the 2019 guidance guaranteed that every infected inmate, regardless of the extent of the inmate's liver scarring, was eligible for (though by no means guaranteed to receive) antiviral treatment.

As for funding, Williams explained that the Department used all the money budgeted for hepatitis C to purchase direct-acting antivirals, and that he had repeatedly sought budget increases for hepatitis C treatment. From 2016 to 2017, for example, the Department's budget for hepatitis C was just $600,000. In 2017 and 2018, that amount increased to $2.6 million; and in 2019, that amount increased to $4.6 million, plus a one-time allocation of almost $25 million. Williams said he planned to "spend every penny" of that money on direct-acting antivirals. He further estimated that, based on funding levels in the 2019 fiscal year, the Department would be able to provide antivirals to more than 1,800 infected inmates—in other words, to every inmate with advanced liver scarring.

After the trial, the court issued its findings of fact and conclusions of law in a thorough and carefully reasoned opinion. The court observed that, under the 2016 policy, the Department's record of treating hepatitis C had been "erratic, uneven, and poor" and "border[ed] on deliberate indifference." And the court credited the testimony of several inmates regarding the personal impact of chronic hepatitis C and the need for timely treatment. But the specific issue before the court was the Department's 2019 guidance. As to that issue, the court found that the Department's system for continuous monitoring was "comprehensive" and "impressive"; and that together with two systems that Williams had designed and implemented—namely, an electronic records-keeping system and the new Department-wide workflow—the guidance "serve[d] the dual goals of maximizing and prioritizing treatment for [infected] inmates." And though the court acknowledged that the Department's practices were not the "gold standard" of care, the court found that those practices met the Department's constitutional obligations.

The court further found that the 2019 guidance itself showed that Williams had used his reasonable medical judgment to care for the class of infected inmates—the very opposite, the court found, of deliberate indifference. The court thus held that that Williams had not been deliberately indifferent to the plaintiffs' medical needs. This appeal followed.

II.

The district court presided over a four-day bench trial in this case (and we have not), so we accord considerable deference to the court's factual findings in its decision.  *See United States v. Demjanjuk*, 367 F.3d 623, 628–29 (6th Cir. 2004).  We may reverse those findings only if clearly erroneous, which means that the record leaves us with a "definite and firm conviction that a mistake has been made."  *Id*.  If the district court's account of the evidence is "plausible in light of the record viewed in its entirety," we "may not reverse."  *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).  We review any legal conclusions de novo.  *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012).

The plaintiffs' sole claim in this appeal is that Williams's failure to provide direct-acting antivirals to every infected inmate amounted to deliberate indifference in violation of the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  That claim has both objective and subjective components.  The objective component requires proof that the plaintiffs had a sufficiently serious medical need.  *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).  The subjective component requires proof that Williams understood yet consciously disregarded the substantial risk that hepatitis C posed to infected inmates.  *See id.* at 738.  To prevail, the plaintiffs must show that Williams's conduct amounted to more than ordinary negligence or medical malpractice.  *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

Here, everyone agrees that hepatitis C is an objectively serious medical condition and that Williams understood the risk that hepatitis C posed.  The only question, then, is whether Williams—and Williams alone—"so recklessly ignored the risk" of hepatitis C, in designing and implementing the 2019 guidance, that he was deliberately indifferent to that risk.  *See Rhinehart*, 894 F.3d at 738.

The answer to that question is clear.  Pursuant to the 2019 guidance, as detailed above, Williams required an in-depth evaluation of every inmate infected with hepatitis C.  He obtained advanced diagnostic equipment for the Department accurately to measure liver scarring in infected inmates.  He required extensive monitoring and continuous care for every infected inmate.  He required an advisory committee of medical professionals—of which he served as

chair—to make individualized decisions regarding treatment for every infected inmate, and to revise those decisions when the inmate's condition so warranted. He repeatedly sought more money to buy direct-acting antivirals for inmates with hepatitis C. And he revised the Department's criteria for access to direct-acting antivirals to favor the sickest inmates—regardless of whether an inmate had advanced liver scarring. Rather than reveal indifference, therefore, the record supports the conclusion that—by the very sort of "prioritization" employed by the plaintiff's own expert, Dr. Yao, and by an extensive latticework of procedures in support—Dr. Williams sought to employ the finite resources at his disposal to maximize their benefit for the inmates in his care.

Yet the plaintiffs maintain that the "best practice" was to treat all chronic hepatitis C patients with direct-acting antivirals, and that anything less amounts to deliberate indifference of their medical needs. No doubt the premise of that argument is true; but the conclusion has nothing to do with the actions of Dr. Williams. The plaintiffs in essence demand that he spend money he did not have.

That leads to the plaintiffs' remaining argument, which is that Dr. Williams violated the Constitution by failing to ask the legislature for even more money than he did ask for. But that is not even a colorable ground upon which to reverse the district court. We set to one side the idea that the Eighth Amendment somehow imposes on state medical officials an obligation to lobby state legislators for some unspecified quantum of funds. For on this record there is precisely zero evidence that Williams could have obtained even more funding than he did obtain, if only he had asked. What the record does show, rather, is that Williams repeatedly sought budget increases for hepatitis C treatment, indeed with considerable success; and that he spent "every penny" of those funds on treating sick inmates. In the real world of limited resources, Dr. Williams's actions pursuant to the 2019 guidance reflected anything but indifference.

\*    \*    \*

The district court's judgment is affirmed.

————————————

**DISSENT**

————————————

RONALD LEE GILMAN, Circuit Judge, dissenting. The essence of the majority's rationale is that Dr. Williams has done the best that he can with the limited financial resources available to him because "there is precisely zero evidence that Williams could have obtained even more funding than he did obtain, if only he had asked." Maj. Op. 8. But in so concluding, the majority fails to consider the serious harm caused by delaying treatment for chronic hepatitis C, focusing instead on the "extensive latticework" of testing and monitoring put in place by Dr. Williams. *Id.* It then posits that Dr. Williams's policy decisions are justified because of insufficient funding. For the reasons set forth below, I respectfully disagree.

**A.      The "deliberate indifference" standard**

To satisfy the subjective component of their deliberate-indifference claim, the plaintiffs must prove that Dr. Williams "'consciously disregar[ded]' a substantial risk of serious harm." *See Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (quoting Model Penal Code § 2.02(2)(c)). This requires a showing that Dr. Williams (1) "subjectively perceived facts from which to infer substantial risk to the prisoner[s]," (2) "that he did in fact draw the inference," and (3) "that he then disregarded that risk by failing to take reasonable measures to abate it." *See Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (citation and internal quotation marks omitted). Dr. Williams has conceded that he subjectively perceived the substantial risk to the plaintiffs. The only remaining question, therefore, is whether Dr. Williams took reasonable measures to abate the risk of harm caused by chronic hepatitis C.

**B.      Whether Dr. Williams's rationing scheme is a reasonable measure**

In considering the measures taken, the majority believes that the rationing scheme employed by Dr. Williams was, if not the "best practice," at least a constitutionally adequate one. Maj. Op. 7–8. It points to the fact that the plaintiffs' expert witness, Dr. Zhiqiang Yao, had previously used a similar system of prioritization during his tenure with the Veterans Administration (VA). Maj. Op. 8. But the majority fails to acknowledge that the medical

establishment's guidance has evolved since Dr. Yao initially followed the VA's prioritization system. As Dr. Yao himself testified, when data began to show the benefits of early treatment and the long-term risks of delay, the VA stopped rationing care for hepatitis C patients.

The professional guidance from the American Association for the Study of Liver Diseases (AASLD) and the Infectious Diseases Society of America (IDSA)—the two organizations responsible for setting the standard of care for hepatitis C—documents this medical evolution. As set forth in the guidance,

> [w]hen the US Food and Drug Administration (FDA) approved the first [direct-acting antiviral] treatment for [hepatitis C] infection, many patients who had previously been "warehoused" sought treatment. The infrastructure (i.e., experienced practitioners, budgeted healthcare dollars, etc.) did not yet exist to treat all patients immediately. Thus, the panel offered guidance for prioritizing treatment first for those with the greatest need.

> Since that time . . . data continue to accumulate that demonstrate the many benefits, both [within the liver] and [outside the liver], that accompany [hepatitis C] eradication. . . . *Accordingly, prioritization tables have been removed from this section.*

AASLD and IDSA, *HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C* (Nov. 2019), "When and in Whom to Initiate HCV Therapy," https://www.hcvguidelines.org/evaluate/when-whom (emphasis added); *see also Atkins v. Parker*, 412 F. Supp. 3d 761, 768 (M.D. Tenn. 2019) (noting that "[a] majority of medical providers in the United States who treat [hepatitis C] follow the AASLD/IDSA Guidance recommendations").

The reasons to treat chronic hepatitis C patients as soon as possible have become increasingly clear, causing rationing schemes such as the one endorsed by Dr. Williams to be abandoned by the medical establishment. *See HCV Guidance.* And, as is relevant here, delaying treatment for inmates with chronic hepatitis C causes precisely the type of "substantial risk of serious harm," *see Farmer*, 511 U.S. at 837, routinely recognized in the Eighth Amendment context. The AASLD/IDSA guidance, in language referenced by Dr. Yao, points to a study showing that waiting to treat a hepatitis C infection until a patient is severely sick increased the patient's risk of liver-related death two-to-five fold as compared to treating the infection at an

earlier stage. *See also Stafford v. Carter*, No. 1:17-CV-00289-JMS-MJD, 2018 WL 4361639, at *17 (S.D. Ind. Sept. 13, 2018) (citing this evidence). This statistic is all the more troubling because the risk of death from hepatitis C is already substantial. Dr. Williams, who has seen 81 inmates die from hepatitis C since direct-acting antivirals became available, is obviously aware of this danger.

Death, moreover, is not the only serious harm caused by delaying treatment for chronic hepatitis C. As Dr. Yao explained, delaying treatment exposes individuals to "depression, fatigue, sore muscles, joint pain, kidney injury, diabetes or glucose intolerance, certain types of rashes or autoimmune diseases, lymphoma and leukemia." Those patients who must wait for treatment until they have advanced fibrosis will suffer irreversible scarring in their livers, and they will need to be monitored for liver cancer for the rest of their lives. These sorts of debilitating but untreated conditions are exactly the type of serious medical needs requiring treatment under Eighth Amendment jurisprudence. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154–55 (6th Cir. 1991) (explaining that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering" (citing *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). Dr. Williams's "patient-specific" policy provides no guidance regarding which patients with mild or moderate fibrosis but severe symptoms will receive treatment.

Indeed, Dr. Williams's failure to enforce even his own guidance suggests that these patients will be left to suffer. Dr. Williams's policy since 2016 has provided that those inmates with advanced fibrosis should be referred for direct-acting antiviral treatment. But the district court found that "approximately 450 inmates" was the number who actually had been treated with the antivirals, despite the fact that at least 1,374 Tennessee Department of Corrections (TDOC) inmates were suffering from advanced hepatitis C at the time of trial. This track record hardly suggests that Dr. Williams will take seriously the needs of patients with severe symptoms but only mild or moderate fibrosis.

**C.      Whether a lack of funding may excuse the rationing scheme**

In this context, the only conceivable reason to withhold treatment from all inmates suffering from chronic hepatitis C is a lack of funding.  Despite the majority's assertion that Dr. Williams's failure to ask for more funding is not "even a colorable ground upon which to reverse the district court," Maj. Op. 8, I believe that the law compels the opposite conclusion.

The Supreme Court's decision in *Watson v. City of Memphis*, 373 U.S. 526 (1963), is instructive.  In *Watson*, the city of Memphis argued that budgetary concerns supported its decision to postpone desegregating local playgrounds, despite the mandate in *Brown v. Board of Education*, 349 U.S. 294, 301 (1955), to desegregate with "all deliberate speed."  Rejecting the city's contention, the Supreme Court explained that "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson*, 373 U.S. at 537.  The majority makes no effort to explain why this general principle that cost cannot excuse an ongoing constitutional violation should not apply here.

Nor does the majority grapple with relevant persuasive precedent from our sister circuits. The Ninth Circuit, for example, cited *Watson* in holding that a "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (applying this principle in the prison-overcrowding context).   Although monetary damages may not be obtained against an official who lacks authority over budgeting decisions, budgetary concerns cannot bar prospective relief. *Id.*

The Eleventh Circuit has similarly held that "when a court is considering injunctive relief against the operation of an unconstitutionally cruel and unusual prison system, it should issue the injunction without regard to legislative financing." *Williams v. Bennett*, 689 F.2d 1370, 1388 (11th Cir. 1982).  Like the Ninth Circuit, the court in *Williams* drew a distinction "between a suit for injunctive relief against a state and a suit for damages against an individual state employee." *Id.* at 1388.  That distinction is of no consequence here because Dr. Williams has been sued in

his official capacity only and injunctive relief is the sole remedy being sought. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n.55 (1978))).

When prisons truly cannot afford to house prisoners in conformity with the Constitution, the answer is to release or transfer prisoners rather than continuing to subject them to unconstitutional conditions. *See Brown v. Plata*, 563 U.S. 493, 502 (2011) (holding that, where prison overcrowding was due to state budget shortfalls, a court-mandated prison-population limit was "necessary to remedy the violation of prisoners' constitutional rights" under the Prison Litigation Reform Act). "Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration. An immediate answer, if the state cannot otherwise resolve the problem of overcrowding, will be to transfer or release some inmates." *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974); *see also Williams*, 689 F.2d at 1388 ("The assumption underlying rejection of the lack of funds defense is that a state is not required to operate a penitentiary system."). Applying this principle to the case before us would require TDOC to make whatever financial or prison-population adjustments necessary in order for it to treat all of the inmates with chronic hepatitis C remaining in its custody.

The majority's lack of focus on the harm being caused by the lack of treatment for chronic hepatitis C is all the more troubling because it will result in a patchwork application of the Eight Amendment from state to state. As the Eleventh Circuit in *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991), explained: "We do not agree that financial considerations must be considered in determining the reasonableness of inmates' medical care to the extent that such a rationale could ever be used by so-called 'poor states' to deny a prisoner the minimally adequate care to which he or she is entitled." *Id.* at 1509 (internal quotation marks omitted); *see also Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1300 n.15 (N.D. Fla. 2017) (citing *Harris* to explain why a lack of funding is no excuse for withholding direct-acting antivirals from hepatitis C patients).

The current state of hepatitis C litigation brings this exact concern to the surface. In *Stafford v. Carter*, No. 1:17-CV-00289-JMS-MJD, 2018 WL 4361639 (S.D. Ind. Sept. 13, 2018), the district court concluded that all Indiana inmates with chronic hepatitis C had established an

Eighth Amendment violation when they were denied treatment. *Id.* at *22. The officials in *Stafford*, unlike Dr. Williams, eschewed cost as the motivating force for their rationing scheme, instead explaining that they prioritized patients in order to offer them individualized treatment. *Id.* at *13–14. By claiming that cost is a reasonable consideration here, Dr. Williams is essentially arguing that what has been held to be cruel and unusual in Indiana is not cruel and unusual in Tennessee.

Even accepting the majority's tenuous premise that Dr. Williams should not be held responsible for his limited budget, the argument would carry more weight had Dr. Williams actually requested full funding and not received it. But nothing in the record shows that Dr. Williams ever *asked* for enough funding to treat all of the inmates suffering from chronic hepatitis C. And because requesting funding and setting medical budgets are Dr. Williams's responsibilities, the seeking of such funding was the one "reasonable measure[]," *see Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018), that Dr. Williams simply did not take. Indeed, Dr. Williams apparently had no problem securing $26.4 million in allocations for direct-acting antivirals during the 2019–2020 fiscal year because he acknowledged that the TDOC commissioner, Tony Parker, "knew there was a need there . . . for the drug." Dr. Williams further explained that Parker "never told us no" when it came to asking for money for direct-acting antivirals. I therefore see no justification for Dr. Williams not asking for greater funding.

This is all the more true because the state, one way or the other, will bear the substantial costs of treating hepatitis C patients. As Dr. Yao pointed out, treating all inmates who have chronic hepatitis C now will likely save the state money in the long run because advanced infections typically require costly treatment associated with conditions like cirrhosis and liver cancer. Similarly, the United States Department of Justice Office of the Inspector General, in a review of the Federal Bureau of Prisons' (BOP) treatment practices, determined that "while it would cost the BOP about $1.05 million to treat 100 inmates diagnosed with Hepatitis C, leaving them untreated could cost $15.33 million." Office of the Inspector General, *Review of the Federal Bureau of Prisons' Pharmaceutical Drug Costs and Procurement* (Feb. 2020), *available at* https://oig.justice.gov/sites/default/files/reports/e20027_1.pdf. Dr. Williams or his successors

will thus have to deal with the costs of hepatitis C either way.  The majority's reference to "the real world of limited resources," Maj. Op. 8, fails to take this hard reality into account.

None of this is to say that the Constitution forbids *any* consideration of cost by prison officials.  An official may choose a less expensive treatment among several reasonable options. *See Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (recognizing "that prisons have legitimate reasons to be concerned with the cost of medical treatment for inmates").  But officials may not resort to a treatment that they know to be ineffective—or refuse to treat a patient who has a serious medical need at all—merely to avoid paying the bill.  *See id.* at 373 (holding that a reasonable jury could find that the prison official in question disregarded a risk of serious harm when he knowingly prescribed a less expensive drug instead of the "only effective treatment" for the inmate's serious medical condition); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) ("While the cost of treatment is a factor in determining what constitutes adequate, minimum-level care, medical personnel cannot simply resort to an easier course of treatment that they know is ineffective.").

**D.    Conclusion**

In sum, I believe that the majority has failed to consider the substantial risk of serious harm implicit in Dr. Williams's rationing scheme.  I further conclude that a lack of funding does not excuse the Eighth Amendment violation shown by the plaintiffs in the present case.  For these reasons, I would reverse the judgment of the district court and remand the case with instructions to require TDOC to comply with the community standard of care for inmates with hepatis C.