NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0338n.06

No. 23-5965

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CORRENIA J. PROFITT, individually and as
Administratrix of the Estate of Corbin Raie Hill;
SHAWN D. HILL,

  Plaintiffs-Appellants,

v.

HIGHLANDS HOSPITAL CORPORATION, et al.,

  Defendants,

UNITED STATES OF AMERICA,

  Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 01, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

OPINION

Before: KETHLEDGE, THAPAR, and DAVIS, Circuit Judges.

KETHLEDGE, J., delivered the opinion of the court in which THAPAR and DAVIS, JJ., joined. THAPAR, J. (pp. 13–15), delivered a separate concurring opinion.

KETHLEDGE, Circuit Judge. Correnia J. Profitt received an emergency caesarean with only local anesthesia. Her newborn son, Corbin Raie Hill, died two days later. Profitt and Corbin's father, Shawn Hill, sued the hospital and the United States, alleging claims of medical negligence. After a bench trial, the district court found that Profitt's obstetrician was not negligent. We affirm.

I.

A.

On January 2, 2017, plaintiff Correnia Profitt was 38 weeks pregnant with her son, Corbin Raie Hill. Profitt received prenatal care at Physicians for Women and Families, a federally funded

medical center in Floyd County, Kentucky. Profitt's midwife at Physicians for Women, Krissy Marcum, had previously designated Profitt's pregnancy as "high risk" because Profitt used methadone.

At around 5:00 p.m. on January 2, Profitt arrived at the Highlands Regional Medical Center complaining of severe abdominal pain, decreased fetal movement, and potential fluid leakage. Two nurses, Nurse Tiffany Burke and Nurse Andrea Hopson, treated Profitt. Burke first performed a vaginal examination on Profitt to confirm that she was not going into labor, checked the softness of Profitt's abdomen between contractions, and placed an external fetal monitor on Profitt to track Corbin's fetal heart rate. She also regularly asked Profitt about her symptoms. Burke's notes indicate that Profitt told Burke she had no vaginal bleeding or fluid leakage.

At 6:25 p.m., Burke called Dr. Sammie Gibson, Highlands' on-call obstetrician, to report Profitt's symptoms. Gibson worked for Physicians for Women but had never met Profitt. Gibson told Burke to continue monitoring Profitt for "a couple hours."

At 7:00 p.m., Hopson took over monitoring Profitt. About an hour later, according to Hopson's notes, Profitt said she was no longer feeling any abdominal pain. Hopson called Gibson at 9:00 p.m. and told her that Profitt's cervix had not changed, that Corbin had a normal heart rate (130 beats per minute), and that she had noticed no fluid leakage or blood during Profitt's most recent vaginal examination. Hopson also relayed that Corbin was so active that she had needed to move the fetal monitor several times. Gibson reviewed Profitt's fetal heart strips, which tracked Corbin's heart rate, from home. After speaking with Hopson, Gibson told her to discharge Profitt. The hospital staff discharged Profitt at 9:28 p.m.

Sometime after Profitt left the hospital, she experienced a concealed placental abruption, which occurs when the placenta separates from the uterine wall before the baby is born. Placental

abruptions block the transportation of oxygen through the placenta, preventing the baby from receiving oxygen.

Profitt returned to the hospital just a few hours later, at 2:32 a.m. She again complained of abdominal pain, fluid leakage, and no fetal movement. A nurse noted that Profitt's abdomen was "rock hard." At 2:53 a.m., Corbin's heart rate was in the 90s and decelerating, which meant that he was oxygen deprived and at risk of brain damage or death.

Hopson called Gibson at 2:58 a.m. to report Profitt's symptoms. Gibson concluded that Profitt was likely experiencing a placental abruption and ordered the nurses to prepare Profitt for an emergency caesarean. Gibson also told Hopson to contact an anesthesia provider and the on-call pediatrician. The nursing staff contacted a Certified Registered Nurse Anesthetist (CRNA), Brenda Watson, to assist. Staff also attempted to reach the on-call anesthesiologist, Dr. Raymond Monaco, but he did not answer the phone.

Gibson then began driving to the hospital. On the drive, she called the hospital again to tell the staff to call Monaco; Gibson wanted both the CRNA and the anesthesiologist present for the caesarean.

Gibson's operating notes say that she "arrived" at approximately 3:20 a.m., though the parties dispute whether that means she arrived at the hospital or the operating room. She ran from the parking lot to the operating room, at which point she realized that neither Watson nor Monaco were present. Corbin's heart rate was 74 beats per minute when Gibson arrived—which meant that he was suffocating and beginning to experience brain damage.

Once in the operating room, Gibson rolled Profitt on her side to find Corbin's heart rate, but it was no longer detectable. Gibson then rolled Profitt onto her back and told Profitt that she

needed to perform an emergency caesarean with only local anesthesia. Profitt told Gibson to "do whatever you have to do to save my baby."

Gibson asked Hopson to get lidocaine, a local anesthetic. As Hopson went to remove the lidocaine from the Pyxis machine, which stores medication, Gibson squirted antiseptic on her hands and put on gloves and a gown. By the time Gibson stepped back to the operating table, Hopson had retrieved the lidocaine. Gibson then injected Profitt with lidocaine and, without waiting for it to become fully effective, began the caesarean. According to Gibson's notes, Corbin was delivered at approximately 3:25 a.m. Gibson said that Corbin was delivered within one minute of starting the caesarean; Hopson said that Corbin was delivered "just a few minutes" after Gibson arrived in the operating room.

At birth, Corbin had no heartbeat, so hospital staff immediately began chest compressions on him. Once CRNA Watson arrived at 3:30 a.m., Gibson directed her to care for Corbin. Watson intubated Corbin at 3:32 a.m. The pediatrician, Dr. Leslieann Dotson, arrived a few moments after Watson arrived.

After Corbin was intubated, Watson asked if Gibson wanted Watson to give Profitt something to "put her to s[l]eep or give her some Pitocin" (a synthetic oxytocin). Gibson said "no." Gibson implored the staff to once again call Monaco, the anesthesiologist on call, since Watson was still tending to Corbin. During this conversation, Profitt was conscious and without pain relief. Monaco finally arrived at the hospital around 4:00 a.m., at which point he administered anesthesia and Gibson completed the caesarean.

Corbin's doctors later determined that Corbin's right lung had collapsed, which the plaintiffs allege was the result of improper intubation. Corbin was airlifted to the University of Kentucky Medical Center, where he died two days later.

B.

In 2019, Profitt and Corbin's father, Shawn Hill, sued the United States, alleging claims of medical negligence under the Federally Supported Health Centers Assistance Act and the Federal Tort Claims Act. 42 U.S.C. §§ 233, *et seq.*; 28 U.S.C. § 2671. Those Acts make the United States liable for the medical negligence of its agents or employees. All parties agree that Gibson, who received federal funding, was an agent or employee of the United States. The plaintiffs also brought claims against the hospital and Monaco, the on-call anesthesiologist who failed to show up until 4:00 a.m. The parties settled those claims.

At the start of litigation, the district court set a scheduling order that gave the parties a deadline of October 1, 2019, to file any motions to join additional parties or amend the pleadings. The parties then proceeded to discovery. The plaintiffs took ten depositions, as permitted by Federal Rule of Civil Procedure 30, and then moved to depose two more witnesses—one of whom was Dotson, Corbin's pediatrician. The district court granted the plaintiffs' motion to depose Dotson, and the plaintiffs did so on April 8, 2021. The parties completed all fact discovery by January 29, 2021.

On June 18, 2021—two months after Dotson's deposition and twenty months after the deadline for amendments—the plaintiffs moved to amend their complaint, alleging claims against the United States based on Dotson's alleged negligence. The district court denied the motion, reasoning that the plaintiffs knew about Dotson's involvement in Corbin's care well before the October 1, 2019 amendment deadline and thus had not been diligent in pursuing their claim.

In June 2022, the district court held a bench trial. Over the course of four days, the court heard testimony from nine witnesses, including two expert witnesses: Dr. Ronald Jacobs for the

plaintiffs and Dr. Mary D'Alton for the government. The district court also considered the deposition transcripts of eleven medical providers, including two more plaintiffs' experts.

After hearing all the evidence, the district court issued a 28-page opinion rejecting each of the plaintiffs' negligence claims. At the outset, the district court found that the plaintiffs' expert, Dr. Jacobs, had lacked "a firm understanding of the concept of the standard of care" during his testimony and that he had sometimes conflated his personal standards with the more objective standard of care. The district court concluded that the government's expert, Dr. D'Alton, by contrast, "displayed an understanding of the standard of care."

The court next concluded that Gibson had not breached the standard of care by discharging Profitt on January 2 without personally examining her. Specifically, the court found that Profitt's symptoms had resolved before Gibson discharged her; that Gibson had no reason to think Profitt was at risk for a placental abruption; and that Profitt had not displayed any symptoms of a placental abruption during her first visit. Next, the district court concluded that Gibson had not breached the standard of care in performing the emergency caesarean. Specifically, the court made findings as to the sequence of events between Gibson's arrival and Corbin's birth, and held that the plaintiffs lacked evidence that Gibson had "wasted any time" in performing the procedure or otherwise deviated from the standard of care. Finally, the district court rejected the plaintiffs' post-trial theory that Gibson had breached the standard of care by waiting for Monaco to arrive before administering anesthesia; to the contrary, the court found, the only person who could have administered anesthesia—Watson—was tending to Corbin until Monaco finally arrived at 4 a.m.

This appeal followed.

II.

A.

The plaintiffs argue that the district court should have granted them leave to amend the complaint after the scheduling deadline expired. We review that decision for an abuse of discretion. *Leary v. Daeschner*, 349 F.3d 888, 904 (6th Cir. 2003).

The district court set an October 1, 2019, deadline by which parties could move to amend their pleadings. Profitt filed her motion to amend on June 18, 2021, "long after" that deadline, "which means the court's discretion to allow [the amendment] was limited by Civil Rule 16(b)." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 843-44 (6th Cir. 2020). That rule requires the district court to issue a scheduling order that sets a deadline for amending pleadings and thus "ensure[s] that at some point both the parties and the pleadings will be fixed." *Leary*, 349 F.3d at 906 (internal quotation marks omitted). When a party misses that deadline, the court may grant leave to amend only if the party shows "good cause" for its failure to make the amendments before the deadline. *See* Fed. R. Civ. P. 16(b)(4). That requires parties to show that "despite their diligence they could not meet the original deadline." *Leary*, 349 F.3d at 907.

Here, to show "good cause," the plaintiffs argue that Dotson's deposition revealed new facts regarding her involvement in Corbin's care, as well as evidence that Dotson breached the standard of care. But a party cannot show diligence when it is "aware of the basis of [a] claim for many months" and fails to pursue that claim. *Id.* at 908. And here the medical records—which the plaintiffs possessed well before October 1, 2019—repeatedly identified Dotson as Corbin's pediatrician, attending doctor, and "infant care provider." For example, Gibson's notes direct the reader to see "Dr. Dotson's documentation concerning the infant, Apgars, resuscitation, etc." Corbin's medical records, in turn, note that Dotson was intimately involved in Corbin's care after

she arrived at the hospital at 3:30 a.m.  Staff placed Corbin's umbilical catheter "per Dr. Dotson." Staff gave Corbin "epi" (epinephrine) and "NS" (saline) "per Dr. Dotson."  Corbin was placed under a radiant warmer "per Dr. Dotson," though the warmer was later "turned off per Dr. [D]otson's order."  The "STAT CXR" (chest X-Ray) to check the "placement of ET tube" was ordered "per Dr. Dotson."  Profitt's proposed amendments to her pleadings concern Dotson's "allegedly negligent supervision of Corbin's care."  Order at 8, R. 258, PageID 3557.  Given the information plainly available in those records, she could have developed her claim against Dotson much sooner than she did.  Profitt therefore cannot show that her claim of Dotson's negligence "was unavailable prior to [Dotson's] deposition."  *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 879 (6th Cir. 2020).

The plaintiffs counter that whether Dotson deviated from the standard of care is a "complex medical question" that a layperson could not reasonably assess "absent the assistance of a qualified medical expert."  But most claims of medical malpractice are complicated—and Rule 16(b) applies to them nonetheless.  The plaintiffs also say that the "medical records were so vague and scarce in details" that even their medical expert could not be certain that Dotson committed medical malpractice before reviewing Dotson's deposition. But pleading standards have never required certainty on behalf of litigants.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The district court had ample grounds for its conclusion that the plaintiffs could have asserted a claim based on Dotson's actions before the deadline.

Nor do we have any basis to reject the court's conclusion that an untimely amendment would have prejudiced the defendants, given that (as the court found) the amendment would have required "re-opening discovery" and "extensive further legal briefing."  Order at 10, R. 258,

PageID 3559. The district court did not abuse its discretion in denying plaintiffs' untimely motion to amend.

## B.

Despite that denial, the plaintiffs moved for partial summary judgment against the United States based on Dotson's alleged negligence. We review the district court's denial of that motion de novo. *Messing v. Provident Life & Accident Ins. Co.*, 48 F.4th 670, 682 (6th Cir. 2022).

The plaintiffs assert that, when a defendant receives "sufficient notice and opportunity to defend against a theory or claim not pleaded in the complaint, the theory or claim may be considered on summary judgment." But the United States had no opportunity to defend against the claim regarding Dotson. Plaintiffs raised it after the close of fact discovery, denying the United States the ability to "investigate [it] when [it] conducted its own discovery." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (cleaned up). Moreover, though the plaintiffs say that the United States had "ample time and opportunity to retain an opinion witness to address Dotson's conduct," the United States had no reason to do so—since the court had correctly denied the plaintiffs' motion to amend their complaint to include that claim. The plaintiffs sought summary judgment on a claim that was not part of the case; the district court was right to deny it.

## C.

The plaintiffs also challenge certain of the district court's findings and conclusions after its four-day bench trial regarding their claims that Dr. Gibson was negligent. We give the district court's factual findings "considerable deference" and review them only for clear error. *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020).

Kentucky law governs this action. *Ward v. United States*, 838 F.2d 182, 184 (6th Cir. 1988). Here, under Kentucky law, the plaintiffs needed to prove (among other things) that Gibson violated the relevant standard of care. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982).

The plaintiffs first challenge the court's conclusion that Gibson complied with the standard of care when, on January 2, she relied on two nurses' reports to decide whether to discharge Profitt. The court found that Corbin's fetal-monitoring strips—whose data Gibson reviewed from home— were "normal" and "did not indicate any problem" that would require Gibson to go to the hospital; that the two nurses who treated Profitt, Burke and Hopson, accurately relayed Profitt's symptoms and statements to Gibson; and that Profitt's symptoms (abdominal pain and reduced fetal movement) had resolved before Gibson discharged her.

Plaintiffs dispute none of these facts, but instead point to Jacobs' testimony that relying on information conveyed by "inexperienced" nurses—like, they say, Burke and Hopson—violates the standard of care. As the district court observed, however, Jacobs "conceded that he does not personally inquire about the experience of the nurses on a delivery team." And D'Alton testified that relying on a nurse's statement for patient information does not violate the standard of care— to the contrary, doctors do it "all the time" because nurses are their "eyes and ears." Moreover, the district court's decision to credit D'Alton over Jacobs was not clearly erroneous, given that Jacobs sometimes confused his own standards with the standard of care. As Jacobs himself admitted, he "confused sometimes being furious with falling below the standard of care." The district court's conclusion that Dr. Gibson did not violate the standard of care by relying on the nurses' reports is thus "plausible in light of the record viewed in its entirety." *Atkins*, 972 F.3d at 739.

The plaintiffs next challenge the court's conclusion that Gibson complied with the standard of care when performing Profitt's caesarean. Both experts agreed that when dealing with an oxygen-deprived baby like Corbin, "every second counts." The district court, for its part, found that Gibson pulled into the hospital parking lot and raced up two flights of steps to the operating room, where she realized that no anesthesia provider had arrived. Gibson tried to detect Corbin's heartbeat but found nothing, so she told Profitt that that an emergency caesarean—without anesthesia—was necessary. Once she obtained Profitt's consent, she sent the nurse to get lidocaine as Gibson washed and dressed for surgery, administered the lidocaine when the nurse returned, and immediately proceeded with the emergency caesarean. Thus, the court concluded, Gibson had not "wasted any time" before completing the caesarean.

The plaintiffs contend that Gibson wasted five minutes waiting for an anesthesia provider. As evidence, they point to an order log for the lidocaine, which they say shows that Gibson did not order lidocaine until 3:25 a.m. (after arriving at 3:20 a.m.). But the district court found that Gibson was busily engaged in an unbroken "sequence" of specific events from the time of her arrival in the "OR" to Corbin's delivery minutes later. Moreover, nearly all relevant evidence indicates that Corbin was delivered at approximately 3:25 a.m., a "few minutes" after Gibson arrived at the hospital.

The plaintiffs likewise contend that Gibson should not have taken time to administer lidocaine to Profitt before the caesarean. But Jacobs (the plaintiffs' expert) testified that he had never performed a caesarean without anesthesia and that doing so would increase the time the procedure takes. The district court did not clearly err in finding that Dr. Gibson wasted no time in performing the caesarean.

Finally, the plaintiffs challenge the district court's finding that Gibson provided Profitt with pain relief as soon as Gibson was able to do so. Specifically, the court found that Gibson repeatedly tried to summon Dr. Monaco before and after the caesarean. Moreover, the court found, the record was "clear that Dr. Gibson observed that CRNA Watson was attending to Corbin after his birth until the arrival of Dr. Monaco." True, Watson testified in her deposition that she had offered to administer anesthesia to Profitt after Corbin was delivered. But we have no basis to reject the district court's conclusion that "Dr. Gibson needed to prioritize the resuscitation of Corbin."

Dr. Gibson, Correnia Profitt, and Corbin alike were dealt a dreadful hand in the OR during the early morning of January 3, 2017. The district court concluded that the plaintiffs had not proved that Gibson violated the standard of care in addressing that situation. We have no lawful basis to set aside that conclusion.

\*       \*       \*

The district court's judgment is affirmed.

THAPAR, Circuit Judge, concurring. I agree with the majority's thoughtful opinion. I write separately to flag a Seventh Amendment concern that I've raised elsewhere. *See Bray v. Bon Secours Mercy Health*, *Inc.*, 97 F.4th 403, 418–21 (6th Cir. 2024) (Thapar, J., concurring).

Correnia Profitt originally sued private doctors and health centers in state court. There, she had a right to try her medical-malpractice suit in front of a Kentucky jury. *See* Ky. Const. § 7. And the Seventh Amendment ensured that her jury-trial right remained intact when Highlands removed her case to federal court. U.S. Const. amend. VII. Yet Profitt received a bench trial. Why? Because the U.S. government substituted itself as the defendant under the Federally Supported Health Centers Assistance Act (FSHCAA) and the Federal Tort Claims Act (FTCA). Together, these statutes preclude jury trials and prevent Profitt from seeking remedies against the private parties she initially sued. *See* 42 U.S.C. § 233(a); 28 U.S.C. §§ 2402, 2679(b)(1).

How can this be squared with the Seventh Amendment? Historically, the answer was sovereign immunity. *See McElrath v. United States*, 102 U.S. 426, 440 (1880); *Wilson v. Big Sandy Health Care, Inc.*, 576 F.3d 329, 333 (6th Cir. 2009). After all, a plaintiff had no right to sue the government. Thus, she isn't guaranteed a jury trial when the government consents to being sued. *See Lehman v. Nakshian*, 453 U.S. 156, 161 (1981). This makes sense when you have a government agent—like a VA doctor—who is clearly from the government. But here, Profitt went to a private hospital to see a private doctor. Absent FSHCAA's unique statutory scheme, the doctor wouldn't be considered a government employee, so Profitt would have a right to try her medical-malpractice case before a jury.

The Supreme Court recently reminded us that when it comes to the Seventh Amendment, "what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2136 (2024). The Seventh Amendment applies to all

claims that are "legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989); *see Jarkesy*, 144 S. Ct. at 2128 ("The Amendment . . . embraces all suits which are not of equity or admiralty jurisdiction.") (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447 (1830)). The cause of action's nature and remedy determine whether a suit is legal in nature, and thus, whether the jury trial right attaches. *See Jarkesy*, 144 S. Ct. at 2129. That means litigants bringing claims that resemble common-law actions and seeking legal remedies are entitled to a jury.

Under *Jarkesy*'s framework, it looks like the Seventh Amendment should apply here. Profitt's tort claims are the paradigmatic example of a "Suit at common law." U.S. Const. amend. VII. The FSHCAA and FTCA don't create public rights—the acts don't fashion "a new cause of action . . . unknown to the common law." *Id.* at 2137 (quoting *Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 461 (1977)). Rather, the FTCA expressly "borrow[s] its cause of action" from Kentucky's medical-malpractice law. *Id.*; 28 U.S.C. § 1346(b)(1). And the founding generation litigated medical malpractice in common-law courts before a jury. *Bray*, 97 F.4th at 421 (Thapar, J., concurring); *see, e.g.*, *Cross v. Guthery*, 2 Root 90, 91 (Conn. Super. Ct. 1794). Moreover, Profitt seeks money damages, the "prototypical common law remedy." *Jarkesy*, 144 S. Ct. at 2129; *see also Wooddell v. Int'l Bhd. of Elec. Workers, Loc. 71*, 502 U.S. 93, 98-99 (1991) ("A personal injury action is of course a prototypical example of an action at law, to which the Seventh Amendment applies."). Yet the FTCA denied Profitt a jury trial.

The plaintiffs didn't raise this issue, so we need not resolve it today. But the FSHCAA and FTCA pose grave Seventh Amendment issues. "The Constitution deals with substance, not shadows." *Cummings v. Missouri*, 71 U.S. (4. Wall) 277, 325 (1867). And *Jarkesy* instructed us

to look at the *substance* of the claims, not who's on either side of the "v.," to determine whether the Seventh Amendment applies. Although Profitt is suing the government, the substance of her claim is Kentucky medical-malpractice law. Future plaintiffs would be wise to raise their Seventh Amendment rights.