RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DWAN BRAY and AARON BRAY, individually and as parents, natural guardians, and next friends on behalf of N. B.,

*Plaintiffs-Appellants*,

*v.*

BON SECOURS MERCY HEALTH, INC., et al.,

*Defendants*,

UNITED STATES OF AMERICA,

*Defendant-Appellee*.

No. 23-3357

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00699—Matthew W. McFarland, District Judge.

Argued: January 24, 2024

Decided and Filed: March 29, 2024

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paul W. Flowers, FLOWERS & GRUBE, Cleveland, Ohio, for Appellants. Kevin J. Kennedy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Paul W. Flowers, Louis E. Grube, Kendra N. Davitt, FLOWERS & GRUBE, Cleveland, Ohio, Daniel N. Moore, THE MOORE LAW FIRM, Cincinnati, Ohio, Myles J. Poster, WAIS, VOGELSTEIN, FORMAN, KOCH & NORMAN, LLC, Baltimore, Maryland, for Appellants. Kevin J. Kennedy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

GIBBONS, J., delivered the opinion of the court in which WHITE and THAPAR, JJ., joined. THAPAR, J. (pp. 20–24), delivered a separate concurring opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   Dwan and Aaron Bray (collectively, "plaintiffs") brought this medical malpractice suit in state court individually and on behalf of their minor child, N.B., against Dr. Timothy J. Thress and various medical entities and actors (collectively, "defendants").  Plaintiffs sought damages stemming from defendants' negligence as to Dwan Bray's pre-natal care and subsequent birth of baby N.B.  But unbeknownst to plaintiffs, Thress was employed by a federally funded health center during his treatment of Bray. In line with the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233(g)–(n), Thress removed the suit to federal court and the United States substituted itself for Thress, requiring plaintiffs to bring their claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).

The government then moved for dismissal, arguing that plaintiffs failed to satisfy the FTCA's administrative exhaustion requirement.  Plaintiffs, in turn, moved first to remand the action to state court, arguing that the FSHCAA did not apply, and later to amend their complaint to demonstrate compliance with the FTCA's exhaustion requirement.  The district court denied both of plaintiffs' motions, finding the FSHCAA applicable and any attempt to amend plaintiffs' complaint futile.  Accordingly, the district court dismissed plaintiffs' FTCA claim without prejudice and remanded plaintiffs' claims against the remaining defendants to state court. Plaintiffs appeal the district court's denial of their motion to remand and its dismissal of their FTCA claim.  Because the district court was correct in both respects, we affirm.

I.

A.  The FSHCAA and the FTCA

The Public Health Service ("PHS") Act makes the FTCA the exclusive remedy against the United States in actions for damages for personal injury or death resulting from the performance of medical, surgical, dental, or related functions by an employee or officer of the PHS while acting within the scope of his or her employment.  *See* 42 U.S.C. § 233(a); *Hui v.*

*Castaneda*, 559 U.S. 799, 806 (2010) ("Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct.").

The FSHCAA, as amended, allows for certain health care entities to apply for federal funds under § 330 of the PHS Act, and, in turn, for the officers, board members, employees, and certain contractors of these entities to be "deemed" employees of the PHS for the purposes of obtaining the same medical malpractice liability protection. 42 U.S.C. § 233(g)–(n); *see Federal Tort Claims Act (FTCA) Medical Malpractice Program Regulations: Clarification of FTCA Coverage for Services Provided to Non-Health Center Patients*, 78 Fed. Reg. 58202 (Sept. 23, 2013). When the FSHCAA applies, the United States substitutes itself in for the defendant, and the action proceeds under the FTCA. 42 U.S.C. § 233(g)(1)(A). The intent of this malpractice coverage is to "increase the availability of funds to health centers to provide primary health care services [] [b]y reducing or eliminating health centers' malpractice insurance premiums," thus freeing up funds to improve patient service, reduce barriers to health care, and implement federally funded programs. Health Res. and Serv. Admin., Federal Tort Claims Act Health Center Policy Manual, at 4 (Updated July 21, 2014).

Employees of § 330-funded entities seeking coverage under the FSHCAA must comport with specific requirements laid out in § 233(g) and accompanying Department of Health and Human Services ("HHS") regulations. *See, e.g.*, 42 C.F.R. § 6.6. These requirements include that the entity be a covered entity; that the individual be a covered employee, contractor, or officer of that entity; and that the individual act within the scope of his or her employment. *Id.* Additionally, coverage applies only to services related to grant-supported activities. 42 C.F.R. § 6.6(d). If a covered individual provided the services at issue to a patient of the covered entity, the services are covered under § 233(g)(1)(B). If the covered individual provided services to a non-patient of the covered entity, however, coverage requires either: (1) a specific determination by the Secretary of HHS as to the coverage of this arrangement (§ 233(g)(1)(C); 42 C.F.R. § 6.6(d)); or (2) that the services fall squarely within a circumstance in which HHS categorically deems covered (42 C.F.R. § 6.6(e)(4)).

Here, the parties' dispute centers on:  (1) whether Thress acted within the scope of his employment in his treatment of Bray; (2) whether Thress's treatment of Bray related to federal grant-supported activities; and (3) whether Thress's treatment of Bray— a non-entity patient— fell within the situation covered by 42 C.F.R. § 6.6(e)(4)(ii).

## B.  Factual Background

On November 11, 2015, Dwan Bray—then thirty-seven weeks pregnant—was admitted to Mercy Health – Anderson Hospital ("Mercy") for health complications including headaches, hypertension, light sensitivity, and blurred vision.  Thress, an obstetrician at Mercy, evaluated Bray.  Despite the fact that Bray's symptoms were consistent with preeclampsia, Thress made no diagnosis and Mercy discharged Bray that night.  Nine days later, Bray gave birth to N.B., who required immediate neonatal resuscitation and was soon diagnosed with hypoxic-ischemic encephalopathy.  Since birth, N.B. "continues to suffer from the sequela of hypoxic-ischemic encephalopathy including epilepsy, hypertonia, catastrophic brain damage, cerebral palsy, and other permanent injuries and damages."  DE 13, Am. Compl., Page ID 272.

Unknown to plaintiffs, Thress was employed by HealthSource of Ohio, Inc. ("HealthSource"), an Ohio-based health center, from 2013 to 2018, where he provided obstetric services such as labor and delivery, as well as pre- and post-natal care.  Thress's employment contract with HealthSource required him to "obtain and maintain hospital privileges as a part of [his] practice."  DE 32-5, Emp. Agreement, Page ID 695.  The contract also provided that:

> Physician will participate in hospital and/or emergency room on-call rotations for hospital care and/or emergency coverage furnished to HealthSource and non-HealthSource patients in accordance with all requirements of applicable on-call agreements executed by HealthSource with hospitals or as otherwise directed by HealthSource.  Physician will deliver hospital-based in-patient and emergency room services to non-HealthSource patients when: (a) the services are required by any hospital as a requirement for medical staff membership, credentials and privileges; (b) the services are required as a result of Physician providing on-call coverage or cross coverage for a provider with whom HealthSource has a written agreement, or (c) the services are requested by hospital staff or physicians in response to emergency situations occurring at the hospital.

*Id.*

Several months before Thress's employment with HealthSource, HealthSource had contracted with Mercy, a local hospital, to account for Mercy's lack of obstetricians to cover nights and weekends. Under the agreement, "HealthSource obstetricians would provide call coverage overnight and on weekends in exchange for Mercy Anderson paying [HealthSource] a flat rate for the physician's time." DE 34-1, Patton Dec., Page ID 733; DE 20-2, Pro. Servs. Agreement, Page ID 347. Starting in 2013, pursuant to this agreement, Thress also provided OB-GYN services at Mercy.

The agreement between HealthSource and Mercy also required physicians like Thress to obtain membership on Mercy's medical staff and comply with all applicable bylaws for obtaining clinical privileges before providing any services at Mercy. Mercy's bylaws, in turn, provided that medical staff members "may admit patients . . . within the scope of granted Clinical Privileges."[1] DE 35-1, Mercy Bylaws, Page ID 749–50. Under Mercy's rules, medical staff members who hold such "privileges must take inpatient call." *Id.*; DE 35-2, Mercy Rules & Reguls., Page ID 794.

The parties agree that HealthSource was a covered community health center under the FSHCAA at all relevant times. HealthSource's grant application laid out the health center's activities that would be within the scope of the federal funding and how those activities addressed the grant's objectives. In its grant application, HealthSource described its obstetrician/gynecologist positions within the "Major Service Category," and specified the provision of pre-natal care, labor and delivery, and post-partum care as "[r]equired [s]ervices." DE 24-1, Health Res. and Serv. Admin. Grant Application, Page ID 458, 460–61. HealthSource did not list Mercy as a service location or activity site anywhere in its application. But the application did explicitly contemplate that HealthSource physicians would admit and see patients at local hospitals. Ultimately, the Health Resources and Services Administration ("HRSA")

---

[1]Mercy provides for three main categories of medical staff: Associate Staff, Active Staff, and Affiliate Staff. Members of both the Associate and Active Staff with clinical privileges must take inpatient call and are authorized to admit patients in line with their clinical privileges. DE 35-1, Mercy Bylaws, Page ID 749–50. The Affiliate Staff, in contrast, consists of practitioners "who do not hold Clinical Privileges" at Mercy Anderson, but hold Associate or Active staff membership at another Mercy hospital location. *Id.* at 750. While the record is not clear as to which level of membership Thress attained, there is no evidence that Thress fell within the Affiliate Staff bucket, as he did not provide care at any Mercy affiliate location besides Mercy Anderson.

approved HealthSource's application for funding under § 330 of the PHSA and in turn, deemed HealthSource and its employees to be employees of PHS for the duration of 2015.

## B.  Procedural Background

On April 30, 2020, plaintiffs sued Thress, Mercy, and other health care entities and providers in an Ohio state court for their conduct related to Bray's pre-natal care and delivery of N.B.  On September 8, 2020, the case was removed to federal court.  The government certified Thress as a "deemed" PHS employee acting within the scope of his employment while treating Bray and substituted itself as the appropriate defendant.  After removal, plaintiffs filed an administrative complaint with HHS on September 18, 2020.  In the federal suit, plaintiffs then moved to remand the case to state court, arguing that the FSHCAA did not apply to Thress's conduct.  Before the district court ruled on the remand issue, the government moved to dismiss in light of plaintiffs' failure to exhaust their administrative remedies as required by the FTCA.

The district court ruled against plaintiffs on both accounts.  First, the district court found Thress's conduct covered by the FSHCAA, thus deeming the United States the appropriate defendant and denying plaintiffs' motion to remand.  Second, the district court granted the government's motion to dismiss based on plaintiffs' failure to exhaust their administrative remedies.  While plaintiffs requested leave to amend their complaint to demonstrate their satisfaction of the FTCA's exhaustion requirement, the district court found that such amendment would be futile.  The district court thus dismissed plaintiffs' claim against the United States without prejudice.  Plaintiffs filed a timely notice of appeal.

## II.

This court reviews a district court's denial of a motion to remand de novo.  *Village of Oakwood v. State Bank & Tr. Co.*, 539 F.3d 373, 377 (6th Cir. 2008).  The party that removed the case to federal court "bears the burden of establishing federal subject matter jurisdiction."  *Id.*; *Heyman v. Lincoln Nat'l Life Ins. Co.*, 781 F. App'x 463, 468 (6th Cir. 2019) (citing *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006)).  A district court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

But "[a]ll doubts as to the propriety of removal are resolved in favor of remand." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

Likewise, we review de novo a district court's denial of a motion to amend a complaint based on a finding that "the amendment would be futile." *Baaghil v. Miller*, 1 F.4th 427, 432 (6th Cir. 2021). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Institute LLC v. Med. Mutual of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). To avoid dismissal under Rule 12(b)(6), a plaintiff must allege facts that, when taken as true, "state a claim to relief that is plausible on its face" and that rises "above the speculative level." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). In addressing a motion to dismiss, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). On appeal, we "review de novo the district court's dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 395–96 (6th Cir. 2016); *cf. Greene v. United States*, 2022 WL 13638916, at *4 (6th Cir. Sept. 13, 2022) (reviewing dismissal for failure to present claim to administrative agency before bringing suit against United States de novo).

III.

A.

*Scope of Employment.* The FSHCAA only covers an individual for conduct within the scope of his or her employment. Here, the district court looked to state law to determine whether Thress was within the scope of his HealthSource employment in treating Bray and found that he was. The district court applied state law to the inquiry pursuant to our unpublished decision in *Davey v. St. John Health*, 297 F. App'x 466 (6th Cir. 2008). Now, plaintiffs argue that the district court erred in using state law as the appropriate metric. Instead, plaintiffs contend, the FSHCAA

and accompanying regulations provide their own considerations governing the scope of employment determination.

We need not decide this issue today, as the substantive law underlying the scope of employment determination is not outcome-determinative. Here, in addition to analyzing Thress's conduct under state law, the district court conducted the very inquiry plaintiffs urge this court to adopt. That is, the district court, like some of our sister circuits that have addressed this statutory and regulatory scheme, addressed whether Thress's treatment of Bray related to grant-supported activities and whether the activity fit squarely within an enumerated exception to the Secretary's particularized deeming requirement. *See O'Brien v. United States*, 56 F.4th 139, 147–51 (1st Cir. 2022); *Friedenberg v. Lane Cnty.*, 68 F.4th 1113, 1130–31 (9th Cir. 2023). And the district court concluded that Thress met each of the FSHCAA's requirements. Accordingly, we need not delve further into this inquiry.

B.

*Related to Grant-Supported Activity.* Section 6.6(d) provides FSHCAA coverage only for "acts and omissions related to the grant-supported activity of [covered] entities." 42 C.F.R. § 6.6(d). The district court found that Thress's conduct at Mercy was sufficiently related to HealthSource's grant-supported activity, even though Mercy was not specified as a service location in HealthSource's grant application. Plaintiffs challenge this ruling on two grounds. Ultimately, however, we agree with the district court.

Plaintiffs first argue that in the case of the provision of care to non-entity patients, the relatedness determination belongs solely with the Secretary of HHS. Here, plaintiffs argue that because the Secretary had not made a particularized deeming decision as to the coverage of the Mercy arrangement, the district court "should have considered only whether [Thress's coverage at Mercy] 'fits squarely within' the exemplary scenarios provided in 42 C.F.R. § 6.6(e)." CA6 R. 12, Appellants' Br., at 31. The relevant portions of § 6.6 read:

> (d) Only acts and omissions related to the grant-supported activity of entities are covered. Acts and omissions related to services provided to individuals who are not patients of a covered entity will be covered only if the Secretary determines that:

(1) The provision of the services to such individuals benefits patients of the entity and general populations that could be served by the entity through community-wide intervention efforts within the communities served by such entity;

(2) The provision of the services to such individuals facilitates the provision of services to patients of the entity; or

(3) Such services are otherwise required to be provided to such individuals under an employment contract or similar arrangement between the entity and the covered individual.

(e) Examples.   The following are examples of situations within the scope of paragraph (d) of this section:

* * *

(4) For the specific activities described in this paragraph (e)(4), when carried out by an entity (and its eligible personnel) that has been covered under paragraph (c) of this section, the Department has determined that coverage is provided under paragraph (d) of this section, without the need for specific application for an additional coverage determination under paragraph (d) of this section, if the activity or arrangement in question fits squarely within these descriptions; otherwise, the health center should seek a particularized determination of coverage.

* * *

(ii) Hospital–Related Activities. Periodic hospital call or hospital emergency room coverage is required by the hospital as a condition for obtaining hospital admitting privileges. There must also be documentation for the particular health care provider that this coverage is a condition of employment at the health center.

Plaintiffs argue that the framework laid out in § 6.6(d) and (e)—the requirement that the Secretary make an individualized determination unless § 6.6(e)(4) applies—should also be applied to the first sentence of § 6.6(d), the relatedness requirement.   While this narrower framing seems plausible, the placement of the relatedness requirement in § 6.6(d) before the language about particularized Secretary determinations suggests that the absence of a determination does not displace the otherwise applicable requirement that the conduct in question be related to grant-supported activity.   The text of § 6.6(d) accordingly does not support plaintiffs' argument that the district court usurped the Secretary's authority in determining whether Thress's conduct related to grant-supported activity.   We thus find that the relatedness

requirement remains distinct from the § 6.6(e) inquiry and can be decided by district courts in the first instance. *See Smith v. Harbison*, No. 4:19-CV-152, 2020 WL 6216758, at *2–3 (M.D. Ga. Oct. 22, 2020) (addressing whether physician's treatment of non-entity patient related to grant-supported activity).

Second, plaintiffs argue that since Thress's conduct at Mercy was completely separate from grant-supported activity, it fails to satisfy the relatedness requirement.[2]  In this vein, plaintiffs argue that the Mercy arrangement also could not fall within § 6.6(e)(4) because such application would undermine the requirement that provision of services to non-entity patients must "facilitate[] the provision of services to patients of the entity."  CA6 R. 22, Appellants' Reply Br., at 10 (quoting § 6.6(d)(2)).  The treatment of an insured patient at a private hospital, plaintiffs argue, cannot be covered because coverage under these circumstances "explicitly do[es] nothing for the patients to whom Congress sought to offer aid."  CA6 R. 12, Appellants' Br., at 33.  Plaintiffs further point to the exclusion of Mercy from HealthSource's grant application, the fact that Thress was not compensated for his Mercy work with grant funds, and that Bray was neither a HealthSource patient nor uninsured as evidence that any conduct at Mercy fell outside the scope of the grant.

But that Thress was not compensated with grant funds for his Mercy coverage does not mean that his coverage falls outside the scope of the FSHCAA.  In providing coverage for conduct "related to" grant-supported activity, § 6.6(d) extends coverage beyond conduct that is itself grant-funded.  42 C.F.R. § 6.6(d).  The Ninth Circuit emphasized this point in rejecting the same argument plaintiffs make here.  *See Friedenberg*, 68 F.4th at 1131 (finding that extending coverage only to grant-funded activities would "ignore the 'related to' language" in § 6.6(d)).  Under this reasoning, the court in *Friedenberg* deemed a jail diversion program related to grant-supported activity even though the program was not grant-funded.  *See id.* ("[I]f the County's Jail Diversion Program is 'related to' activity that is supported by the grant at issue, nothing further is

---

[2]Plaintiffs appear to approach relatedness in two contexts.  First, plaintiffs seem to argue that § 6.6(e)(4) displaces the relatedness inquiry absent a particularized determination by the Secretary and requires that Thress's services further grant objectives.  Second, plaintiffs also emphasize in their briefing that Thress's conduct was completely unrelated to grant activity.  So, while plaintiffs do not use the exact "related to" language in their former argument, the import appears the same and we analyze these arguments together.

required."). Similarly, *Friedenberg* considered the jail diversion program related to grant-funded activity even though the program was not explicitly named in the grant application. *See id.* Although the specific program was not named, the "expressed purposes of the program and the federally funded activities [we]re similar, [so] the acts and omissions in this case at least 'relate to' Lane County's grant-supported activity." *Id.*

While not binding, *Friedenberg*'s reasoning is applicable here. HealthSource did not list "Mercy" or "House Officer" in its application. But its application detailed the conduct that physicians like Thress would engage in at hospitals: the grant application described gynecological, pre-natal, labor and delivery, and post-partum services as "required" services and specified that HealthSource physicians would provide on-call and admitting services at hospitals. DE 24-1, Health Res. and Serv. Admin. Grant Application, Page ID 460–61; *cf. Harbison*, 2020 WL 6216758, at *3 (determining whether language in grant application contemplated the provision of OB-GYN services at third-party hospital). To be sure, *Friedenberg* is not identical to this case, as the location of the jail diversion program was specified in the grant application, while the location of Thress's services here—Mercy—was not. *Friedenberg*, 68 F.4th at 1119, 1131 (citing HRSA guidance indicating that service locations should be indicated in grant applications). But, like *Friedenberg*, the "expressed purposes" of HealthSource's provision of on-call services to Mercy "and the federally funded activities" coincided. *Id.* at 1131.

And critically, contrary to plaintiffs' contention, Thress's provision of services at Mercy did further HealthSource's grant objectives and the provision of care to HealthSource patients. This remains true even though this suit concerns services provided to Bray, a non-patient. HealthSource applied to become a federally qualified health center to "provide[] primary care to people who are either uninsured, underinsured or in need of care in a community." DE 32-1, Patton Dep., Page ID 607. Thress's weekend and night obstetrician coverage furthered this goal by filling a gap in needed services to both HealthSource and non-HealthSource patients alike, as Mercy otherwise lacked the capability to provide weekend and overnight services to individuals that came in. Although Bray happened to be a separately insured non-HealthSource patient, Thress's provision of OB-GYN services at Mercy made these grant-specified services accessible to HealthSource patients coming into the hospital. *See Harbison*, 2020 WL 6216758, at *5

(provision of OB-GYN services at third-party hospital "expanded obstetric options for [the entity's] patients, which is consistent with [the entity's grant] mission of providing medical services to the underserved," even though the specific service was provided to a non-entity patient); *see also* 42 C.F.R. § 6.6(d)(1) (providing coverage where Secretary finds that "[t]he provision of the services to such individuals benefits the patients of the entity").

Accordingly, this is not a case where application of coverage to Thress's conduct at Mercy would immunize conduct divorced from any grant-supported activity and "stretch [the] FSHCAA beyond its breaking point." CA6 R. 22, Appellants' Br., at 34. Rather, Thress's coverage at Mercy related to grant-supported activity, and furthered the goals of HealthSource's grant project and the provision of grant-specified services to HealthSource patients.

C.

*Deeming Regulation.* All agree that this case primarily turns on whether Thress's activities at Mercy fall "squarely within" the circumstances laid out in 42 C.F.R. § 6.6(e)(4)(ii) so as to be considered within the Secretary's deeming of coverage for HealthSource. We find Thress's conduct covered by this provision.

As described above, 42 C.F.R. § 6.6(d) provides that "[a]cts and omissions related to services provided to individuals who are not patients of a covered entity will be covered only if the Secretary" makes a particularized determination that the arrangement satisfies certain enumerated objectives of the FSHCAA. Absent a prior particularized determination as to the coverage of the arrangement by the Secretary, treatment of non-entity patients falls outside the scope of coverage unless it fits within one of the circumstances enumerated by § 6.6(e)(4). Section 6.6(e)(4) enumerates four categories of provision of services to non-entity patients for which HHS has "determined that coverage is provided . . . without the need for specific application for an additional coverage determination" by the Secretary as described in § 6.6(d). To enjoy this coverage, such services must "fit[] *squarely* within" the circumstances listed in § 6.6(e)(4). 42 C.F.R. § 6.6(e)(4) (emphasis added). Absent this neat fit, a particularized determination of coverage by the Secretary is required. This inquiry thus boils down to whether

Thress's provision of services to Bray at Mercy falls squarely within § 6.6(e)(4)(ii), which encompasses:

> (ii) Hospital–Related Activities.  Periodic hospital call or hospital emergency room coverage is required by the hospital as a condition for obtaining hospital admitting privileges.  There must also be documentation for the particular health care provider that this coverage is a condition of employment at the health center.

The district court found that it did.  Addressing the first requirement, the district court found that Mercy required Thress to provide "periodic, on-call coverage" "[a]s a condition of obtaining hospital admitting privileges" at Mercy.  DE 38, Order & Op., Page ID 843 (citing DE 35-2, Mercy Rules & Reguls., Page ID 794).  Further, the district court found that "Thress obtained and maintained hospital privileges at Mercy," and treated Bray during the performance of one of his "required on-call shift[s]." *Id.* at Page ID 833, 840.  As to the second requirement, the district court found that HealthSource required Thress to provide such coverage at Mercy.  Accordingly, the district court deemed the services provided by Thress squarely within the "Hospital-Related Activities" contemplated by § 6.6(e)(4)(ii). *Id.* at Page ID 843.

In challenging this ruling, plaintiffs advance three arguments.  First, they argue that the district court incorrectly found that Thress obtained admitting privileges in exchange for his performance of on-call services at Mercy.  Second, they argue that the district court misread Thress's employment contract with HealthSource, as the contract did not require that Thress obtain admitting privileges at Mercy specifically.  Third, they argue that application of § 6.6(e)(4)(ii) to Thress's treatment of a private patient at a private hospital does not advance the objectives of the FSHCAA and would instead unduly expand FSHCAA coverage.  Because this third argument tracks our prior determination that Thress's conduct at Mercy related to grant-supported activity, we only address plaintiffs' first two arguments below.  Neither is meritorious.

Section 6.6(e)(4)(ii)'s first clause requires that "[p]eriodic hospital call or hospital emergency room coverage" is "required by the hospital as a condition for obtaining hospital admitting privileges."  Plaintiffs devote much of their reply brief to resolving the issue of whether this requirement "was met as a matter of fact."  CA6 R. 22, Appellants' Reply Br., at 3.  To fit squarely within the section, plaintiffs argue, we must find that Thress in fact obtained admitting privileges at Mercy *in exchange* for his on-call services.  Plaintiffs argue that the

asserted purpose of HealthSource's contract with Mercy—the provision of obstetricians to account for Mercy's lack of weekend and night providers—belies the notion that Thress worked on-call at Mercy in exchange for admitting privileges. Put less congenially, plaintiffs allege that Thress instead performed on-call services at Mercy "to fill Mercy's needs and HealthSource's coffers." *Id.* at 6.

Plaintiffs' argument fails because the record supports the conclusion both that Mercy conditioned the obtainment and maintenance of admitting privileges on the performance of on-call shifts like the one in which Thress encountered Bray, and that Thress possessed such admitting privileges at Mercy. And contrary to plaintiffs' position, the regulations demand no more: there is no requirement that privileges be obtained primarily in exchange for on-call services if § 6.6(e)(ii)'s requirements are otherwise met.

We can address the first portion of the relevant inquiry largely by reviewing Mercy's bylaws and its rules and regulations. To this end, plaintiffs concede that Mercy "required" on-call coverage "as a condition of obtaining hospital admitting privileges from the hospital." CA6 R. 22, Appellants' Reply Br., at 9 (quoting CA6 R. 18, Appellee Br., at 20). After reviewing Mercy's bylaws and rules and regulations, we agree with this interpretation.

We also find that Thress treated Bray in accordance with Mercy's on-call coverage requirements. Although the district court found Thress's privileges obtained by virtue of the professional services agreement, while plaintiffs correctly note that the agreement required Thress to separately apply to obtain such privileges, the record otherwise supports the finding that Thress possessed the requisite clinical and admitting privileges at Mercy. We "can affirm the district court on any basis supported by the record," and we do so here. *Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000).

First, while the agreement between HealthSource and Mercy did not itself confer admitting privileges, it did contemplate Thress obtaining such privileges in connection with the duties of an on-call house officer. Likewise, the agreement required Thress to apply for clinical privileges and medical staff membership before performing "any [s]ervices at Mercy." DE 20-2, Pro. Servs. Agreement, Page ID 349. The clinical privileges, in turn, enabled Thress to admit

patients at Mercy.  Had Thress treated Bray, or any other patient at Mercy for that matter, without obtaining appropriate clinical privileges, he would have breached the professional services agreement with Mercy and his employment agreement with HealthSource, both of which required him to comply with all applicable hospital rules and regulations concerning privileges.

The record does not support a finding that Thress breached both contracts and the Mercy bylaws by performing gynecological services at Mercy without the required clinical privileges. Instead, the record demonstrates that Thress possessed the requisite clinical and admitting privileges at Mercy when he treated Bray during his on-call shift.  Because Mercy's applicable bylaws and rules and regulations condition admitting privileges on satisfaction of on-call coverage duties, and because the record otherwise demonstrates that Thress acted in accordance with that condition in his coverage at Mercy, the first requirement of § 6.6(e)(4)(ii) is met.

Section 6.6(e)(4)(ii) next requires "documentation for the particular health care provider that this coverage is a condition of employment at the health center."  Plaintiffs contend that this portion of § 6.6(e)(4)(ii) requires documentation that HealthSource required Thress to obtain *admitting privileges* as a condition of employment, and specifically, admitting privileges *at Mercy*.  But even under this reading, Thress's employment contract with HealthSource, in conjunction with the professional services agreement between HealthSource and Mercy, meets § 6.6(e)(4)(ii)'s requirement.

Thress's employment contract with HealthSource required both that Thress "obtain and maintain hospital privileges" and that he participate in "on-call rotations for hospital care and/or emergency coverage furnished to HealthSource and non-HealthSource patients in accordance with all requirements of applicable on-call agreements executed by HealthSource with hospitals."  DE 32-5, Emp. Agreement, Page ID 695.  Similarly, HealthSource required that Thress provide hospital-based services to non-HealthSource patients when "the services are required by a[] hospital as a requirement for medical staff membership, credentials and privileges."  *Id.*  These requirements tie in HealthSource's agreement with Mercy to provide on-call obstetrics coverage.

And, as previously discussed, Mercy required on-call coverage as a condition of obtaining appropriate clinical privileges, including those related to admissions. Likewise, the agreement between HealthSource and Mercy required Thress to obtain appropriate clinical privileges and membership on Mercy's medical staff prior to providing services at Mercy in accordance with Mercy's bylaws and applicable rules and regulations. HealthSource therefore required Thress to obtain admitting privileges and to provide such coverage at Mercy, and it was during the provision of this coverage that Thress encountered Bray.

We thus reject plaintiffs' contention that because HealthSource's employment contract with Thress did not explicitly name Mercy, it could not have required Thress to obtain admitting privileges at Mercy as a condition of employment. As explained above, the "arrangement" between Thress, HealthSource, and Mercy fit "squarely within" the circumstance set out in § 6.6(e)(4)(ii). *See Harbison*, 2020 WL 6216758, at *4 (finding § 6.6(e)(4)(ii) satisfied even where employment contract did not name the specific hospital at which the physician was required to maintain credentials, but a declaration demonstrated that the employer required the physician to practice and obtain credentials at the hospital in question). We therefore find the FSHCAA applicable to Thress, and we affirm the denial of remand to state court.

D.

*FTCA Exhaustion.* Because this action can proceed only under the FTCA, plaintiffs are subject to 28 U.S.C. § 2675(a)'s administrative exhaustion requirement. This provision mandates that a plaintiff file an administrative claim with the appropriate agency before initiating a suit. Based on plaintiffs' failure to exhaust their administrative remedies, the district court denied plaintiffs leave to amend and dismissed their claim without prejudice. Plaintiffs deem this dismissal in error. They argue that amending their complaint after proper exhaustion to include the United States as a defendant cures their prior failure to exhaust because such amendment would essentially "institute[]" a new action in line with the FTCA. CA6 R. 12, Appellants' Br., at 37 (quoting 28 U.S.C. § 2675(a)). Once again, we agree with the district court.

The FTCA provides that "[a]n action shall not be instituted upon a claim against the United States" for damages for injury or loss caused by acts or omissions of a government employee acting within the scope of his or her employment "unless the claimant shall have first presented the claim to the appropriate Federal agency" and obtained a final decision. 28 U.S.C. § 2675(a). The FTCA excuses the requirement that a plaintiff obtain a final agency decision if the agency fails to make a final disposition within the six months following the filing of the administrative complaint. *Id.* This circuit has described this exhaustion requirement as a "mandatory" claims processing rule. *Kellom v. Quinn*, 86 F.4th 288, 293 (6th Cir. 2023) (quoting *Copen v. United States*, 3 F.4th 875, 880–81 (6th Cir. 2021)); *cf. Greene*, 2022 WL 13638916, at *5 ("Claims-processing rules [like § 2675(a)] must be enforced when properly invoked." (citing *United States v. Alam*, 960 F.3d 831, 834 (6th Cir. 2020))).

The Supreme Court has also spoken on this statutory requirement. The Court interpreted the term "instituted" to be "synonymous with the words 'begin' and 'commence.'" *McNeil v. United States*, 508 U.S. 106, 112 (1993). "The most natural reading of the statute," the Court reasoned, "indicates that Congress intended to require complete exhaustion of Executive remedies *before* invocation of the judicial process." *Id.* (emphasis added). Accordingly, "[t]he FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *Id.* at 113. *McNeil* thus rejected the notion that a plaintiff could generally cure his or her failure to exhaust administrative remedies by exhausting during the pendency of litigation. *Id.* at 111–12.

In an attempt to avoid *McNeil*'s import, plaintiffs urge us to "carve out a narrow exception" to the FTCA exhaustion requirement where an FTCA claim becomes exhausted during litigation and the plaintiff "then seeks to make a subsequent amendment that would render the earlier complaint null and void." CA6 R. 12, Appellants' Br., at 37. But we have interpreted *McNeil* as holding that "[a] plaintiff who fails to comply can't cure that failure by exhausting administrative remedies while the suit is pending: the claim must be reasserted 'in a new action.'" *Kellom*, 86 F.4th at 292 (citing *McNeil*, 508 U.S. at 110–12). *Kellom* rebuffed the notion "that a plaintiff can bring an FTCA claim *before* exhausting and cure the defect by reasserting the same claim in an amended complaint." *Id.* at 293. And while plaintiffs

distinguish *McNeil* by discussing the potential applicability of tolling to their claim, disputes over tolling and accrual speak to application of the statute of limitations—not the exhaustion requirement—to plaintiffs' claim. Such distinctions are therefore inapposite.

Plaintiffs also argue that *McNeil* did not address whether filing an amended complaint after the initiation of suit can "be said to have 'instituted' the case over again" for exhaustion purposes. CA6 R. 12, Appellants' Br., at 39. But this argument is also without merit. Plaintiffs' suit became an action "instituted" on a claim against the United States upon the Attorney General's certification under § 233(c). Resisting this conclusion, plaintiffs cite to out-of-circuit case law for the proposition that they initiated an action under the FTCA only when they moved to amend their complaint to include the United States as a defendant. But such cases are non-binding and remain factually and procedurally distinct.

Many of these cases contemplated amending a plaintiff's complaint to allege substantively new FTCA claims—that is, claims based on facts that were previously the subject of final administrative dispositions but not previously alleged in federal court. *See, e.g., Mackovich v. United States*, 630 F.3d 1134, 1135–36 (8th Cir. 2011) (allowing for assertion of exhausted FTCA claim in amended complaint where the plaintiff "abandoned his initial claim" and essentially "commenced an entirely new action" by asserting an FTCA claim based on newly alleged conduct). Here, in contrast, plaintiffs do not raise a new claim in their proposed amended complaint; rather, they reassert "the same claim" in substance as before—a malpractice claim arising from Thress's failure to diagnose Bray's preeclampsia. *See Kellom*, 86 F.4th at 293 (distinguishing *Mackovich* for this reason); *see also Malouf v. Turner*, 814 F. Supp. 2d 454, 461–62 (D.N.J. 2011) (deeming claim instituted for § 2675(a) purposes upon filing of complaint alleging "a claim of medical negligence cognizable under the FTCA," even though plaintiff did not specifically invoke the FTCA until he attempted to amend the complaint after exhaustion).

So, plaintiffs instituted suit upon the filing of their initial complaint concerning Thress's conduct. The action plaintiffs instituted then became one against the United States, and thus subject to the FTCA's exhaustion requirement, upon the Attorney General's certification and the case's removal to federal court pursuant to § 233(c). At the time of certification and removal,

plaintiffs had not filed, much less exhausted, an administrative complaint concerning the substance of plaintiffs' FTCA claim.[3]

And as previously explained, plaintiffs' attempt to amend their complaint to include the United States as a defendant cannot cure this failure to exhaust. This claim became an FTCA claim against the United States prior to plaintiffs' request to amend the complaint to show the same. Plaintiffs' proposed amendments—specifically those to name the United States as a defendant and label the applicable law as the FTCA—were therefore immaterial, as the application of § 233(g) already rendered this case an action against the United States under the FTCA.[4] We therefore find that the district court correctly dismissed plaintiffs' claim without prejudice for failure to exhaust.

IV.

For the previously discussed reasons, we affirm.

---

[3]Where, as here, a plaintiff initially files suit against a private defendant and the Attorney General certifies the case under § 233(c), the case is instituted against the United States upon the date of certification, when it is "deemed a tort action brought against the United States." *See, e.g., Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 311 (E.D.N.Y. 2008).

[4]That the United States certified Thress as acting within the scope of his employment for FSHCAA purposes and thus converted the case into one against the United States under the FTCA prior to plaintiffs' request to amend their complaint also distinguishes this case from cases cited by plaintiffs. *See, e.g., Grancio*, 572 F. Supp. 2d at 311. The court in *Grancio* allowed a plaintiff to satisfy § 2675(a) by amending her complaint to add an FTCA claim against the United States based on the same conduct alleged in her original complaint against individual informants under state law. *Id.* at 310–11. But *Grancio* did not involve prior Attorney General certification converting the claim to an action against the United States, so the United States was not a party prior to the plaintiff's amendment. *Id.* at 311; *cf. Scott v. Quay*, 19-CV-1075, 2020 WL 8611292, at *12 (E.D.N.Y. Nov. 16, 2020) (R. & R.) (allowing addition of FTCA claim to existing complaint where United States not previously made a party).

_____

**CONCURRENCE**

_____

THAPAR, Circuit Judge, concurring.    Provisions in the Federally Supported Health Centers Assistance Act (FSHCAA) and Federal Tort Claims Act (FTCA) can trap unwary litigants.  So while I agree entirely with the majority opinion, I write separately for two reasons: (1) to explain how litigants can avoid these traps and preserve meritorious claims and (2) to recognize the tension between this statutory scheme and the Seventh Amendment right to a jury trial.

I.

The FSHCAA allows the United States to "substitute in" as the defendant when a covered doctor is sued. If that arrangement sounds familiar, it's because the Westfall Act has similar provisions.  Under both statutes, the government takes the place of an individual defendant.  And under both statutes, the Federal Tort Claims Act provides the exclusive remedy.  42 U.S.C. § 233(a); 28 U.S.C. § 2679(b)(1).  But there are two key differences between the Westfall Act and the FSHCAA that can introduce a host of hurdles—even for plaintiffs with meritorious claims.

First, plaintiffs suing an FBI or Border Patrol agent, for instance, will usually know they're dealing with a member of the federal government.  So they'll know that the Westfall Act and FTCA will apply.  By contrast, plaintiffs will rarely know whether their doctor is subject to the FSHCAA.

This case is a good example:  Bray had private insurance, she was a patient at a privately funded hospital, and her doctor was listed as staff of Mercy hospital—a private, nonprofit health center.  What reason was there for Bray to suspect the United States was lurking in her hospital room?  There wasn't any.  Nor would there be any reason for plaintiffs in her situation to know ahead of time that the FTCA, rather than state malpractice law, would govern their claims.  That means they'll face several surprise hurdles when litigation begins, such as the FTCA's two-year statute of limitations or administrative-exhaustion requirement.

The second difference is jurisdictional. The Westfall Act applies to federal employees. So once the government substitutes itself as the defendant, federal jurisdiction is conclusively established. 28 U.S.C. § 2679(d)(2). As a result, a case under the Westfall Act can never be remanded to state court. *Osborn v. Haley*, 549 U.S. 225, 241 (2007). Once the United States substitutes in, plaintiffs have no option but to litigate their claims in federal court.

By contrast, government substitution doesn't conclusively establish jurisdiction under the FSHCAA. *O'Brien v. United States*, 56 F.4th 139, 147 n.6 (1st Cir. 2022). That's because the line between government and private healthcare is often blurry. Here, for instance, HealthSource received money from both the federal government and from private sources. In situations like this, the government occasionally draws the line incorrectly and substitutes itself for a defendant when it shouldn't have. When that happens, the FSHCAA instructs the district court to remand the case to state court. 42 U.S.C. § 233(c). And because state medical malpractice claims have several advantages over FTCA claims—e.g., a jury trial and no exhaustion requirements—plaintiffs will often have an incentive to litigate jurisdiction before proceeding against the government.

Here comes the rub. Before plaintiffs can file an FTCA claim, they must first exhaust their remedies with the relevant administrative agency. And if a plaintiff doesn't file with the agency within two years, her claim is time-barred. 28 U.S.C. § 2401. But again: a plaintiff suing a private doctor typically has no reason to know whether the doctor is deemed a government employee or whether the claim falls under the FTCA. So when plaintiffs first file suit, thinking they have plenty of time, they're in for a rude awakening. Here, for instance, plaintiffs would've had at least until a year after N.B.'s eighteenth birthday to bring their state tort claims. *Fehrenbach v. O'Malley*, 862 N.E.2d 489, 490 (Ohio 2007). As compared to the FTCA, that's a seventeen-year gap that'll no doubt trap many litigants.

But even when plaintiffs are on time, they still face a hard choice. Recall that plaintiffs with unexhausted claims will likely want to challenge federal jurisdiction under the FSHCAA. If they lose this jurisdictional dispute, their claim will be dismissed for failure to exhaust. On the flip side, if a litigant voluntarily dismisses her suit to exhaust, she might forfeit her ability to challenge jurisdiction under the FSHCAA.

In this case, Bray tried to avoid this problem by administratively exhausting her claim while she challenged jurisdiction in court. But this creates a new problem: once a plaintiff exhausts her administrative remedies, she has only six months to institute a new FTCA action in federal court. And a plaintiff can't just amend the complaint in her ongoing lawsuit since that doesn't "institute" a new action. *Kellom v. Quinn* (*Kellom II*), 86 F.4th 288, 292 (6th Cir. 2023). So if a plaintiff exhausts her claim but continues to litigate jurisdiction in her preexisting case, six months might expire before the court hands down its jurisdictional ruling. If that happens, and if the federal court upholds jurisdiction, then the plaintiff will be out of luck: the original claim will be dismissed for failure to exhaust, and any new, post-exhaustion claims will be past the six-month window.

## II.

Fortunately, there's a path that allows litigants to challenge jurisdiction and exhaust administrative remedies while protecting their claims from being time-barred.

To do this, plaintiffs should file a separate, "protective" action in federal court after they exhaust, even as their jurisdictional dispute continues in the original case. This allows plaintiffs to properly institute a new, exhausted claim against the government while also not losing progress in their jurisdictional dispute. As often happens in these circumstances, the district court can consolidate the two actions. Plaintiffs could even provide advance notice to the judge presiding over their initial action that they plan to take these steps. That way, the judge won't misinterpret the protective action as conceding federal jurisdiction. Instead, like arguing in the alternative, plaintiffs using this strategy would simply be protecting their options should they lose on jurisdiction.

But what about litigants who are already out of time? Although the majority opinion doesn't decide this issue, equitable tolling might be appropriate. *See United States v. Wong*, 575 U.S. 402, 420 (2015). Under the FSHCAA, even litigants who diligently pursue their claims might be completely unaware of a defendant's federal status. Indeed, they might not discover that their malpractice claim is subject to the FTCA—and its two-year statute of limitations—

until it's too late.  When litigants fall into this trap through no fault of their own, equitable tolling may be appropriate.

Other circuits have diverged on this issue.  *Compare Santos ex rel. Beato v. United States*, 559 F.3d 189, 203–04 (3d Cir. 2009) (tolling), *with Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir. 2002) (no tolling), *Gould v. HHS*, 905 F.2d 738, 745 (4th Cir. 1990) (same), *and Motley v. United States*, 295 F.3d 820, 824 (8th Cir. 2002) (same).  But granting equitable tolling in a case like this one would not create or deepen a circuit split.  The cases from the First, Fourth, and Eighth Circuits are distinguishable from cases like Bray's.  In those cases, plaintiffs were patients of either commissioned Public Health Service officers or federally funded health centers.  *Gould*, 905 F.2d at 740 (officer); *Gonzalez*, 284 F.3d at 286 (federally funded center); *Motley*, 295 F.3d at 821, 824 (same).  Thus, those plaintiffs likely had notice that they were dealing with the federal government.  That's not true here.  As discussed, Bray was a private patient at a private hospital.  And Dr. Thress was listed on Mercy's staff.  Bray had no reason to know he was covered by these statutes.  Plaintiffs with these—or similar—facts may merit equitable tolling.

III.

This statutory scheme also raises interesting questions about a plaintiff's jury trial right.  There are two dimensions to this right.  First, Bray had a right to try her medical malpractice claim to a jury in state court.  *See* Ohio Const. Art I. § 5.  Upon removal, however, that right became a Seventh Amendment right.  The Seventh Amendment protects the right to a jury trial for claims that existed or are analogous to those "at common law."  U.S. Const. amend. VII; *Tull v. United States*, 481 U.S. 412, 417 (1987).  And medical-malpractice claims for money damages, like Bray's, would've been tried by a jury at common law.  *See, e.g.*, *Landon v. Humphrey*, 9 Conn. 209, 210 (1832), *overruled on other grounds by Crosby v. Fitch*, 12 Conn. 410 (1838).

Of course, the Supreme Court has told us that in certain instances, Congress can eliminate jury trials for federally created, public-law rights.  *Cf. Atlas Roofing Co. v. OSHA*, 430 U.S. 442, 450 (1977).  But that's not what happens under the FSHCAA.  The FTCA adopts the state's

preexisting causes of action—it doesn't create a new public-law right.  28 U.S.C. § 1346(b). And here, medical malpractice would ordinarily be tried before a jury.  So in effect, Congress has adopted the state cause of action, but eliminated the jury-trial right.

Doesn't this fly in the face of the Seventh Amendment?  It certainly appears that way. That said, plaintiffs suing under the FTCA seek money damages against the government. 28 U.S.C. § 1346(b).   And as the Supreme Court has held, lawsuits against the sovereign generally didn't exist at common law.  *See Glidden Co. v. Zdanok*, 370 U.S. 530, 572 (1962). *But see Tull*, 481 U.S. at 414, 427 (jury trial right when government brings action); 3 William Blackstone, *Commentaries on the Laws of England* *259 (sovereign as plaintiff).  If the relevant analog is a claim *against the government*, then the Seventh Amendment may permit eliminating a jury trial here.  *See Wilson v. Big Sandy Health Care, Inc.*, 576 F.3d 329, 333 (6th Cir. 2009). In other words, the Seventh Amendment question may hinge on how you define the analogous claim at common law.

But defining a claim based on the defendant has troubling implications.   Imagine Congress passed a law substituting the government in any suit against medical providers that accept Medicare or Medicaid.  And imagine the FTCA applied to these suits.  Such a law would essentially eliminate jury trials for all medical-malpractice claims.  Or take it even further. Congress could turn *any* state common-law claim within its legislative power into a suit against the government, functionally nullifying the Seventh Amendment.

At some point a line will have to be drawn.  But that is a question for another day.